**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————————
                                                :
NEW JERSEY PEACE ACTION, et al.,    :
                                                :
                  Plaintiffs,               :
         v.                                 :         CIVIL ACTION NO. 08-2315 (JLL)
                                                :
BARACK H. OBAMA[1],                    :
President of the United States in his official  :         **OPINION**
capacity,                                   :
                                                :
                  Defendant.               :
                                                :
—————————————————————

**LINARES**, District Judge.

Pending before this Court is Defendant's motion to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).  Having heard oral argument and having considered the briefs filed on behalf of the parties, the Court grants Defendant's motion to dismiss.

**I.**    **Background**

On May 13, 2008, Plaintiffs filed a Complaint instituting the present action. Subsequently, on September 8, 2008, Plaintiffs filed an Amended Complaint against the President of the United States, in his official capacity, seeking a declaratory judgment that the "war in Iraq is being waged in violation of Article I, Sec. 8 of the United States Constitution." (Am. Compl. ¶ 1.)  Plaintiffs allege the following.

On October 16, 2002, President Bush signed into law the Authorization for Use of

—————————————————————

[1] The Court has automatically substituted the original Defendant in this matter – George W. Bush – with the new President, Barack H. Obama.  Fed. R. Civ. P. 25(d)(1).

Military Force Against Iraq Resolution of 2002, H.J. Res. 114, 107th Congress (2d Sess. 2002)

(the "AUMF").  The AUMF provided as follows:

> The President is authorized to use the Armed Forces of the United States as he
> determines to be necessary and appropriate in order to –
>
> > (1) defend the national security of the United States against the continuing threat
> > posed by Iraq; and
>
> > (2) enforce all relevant United Nations Security Council resolutions regarding Iraq.

AUMF, § 3(a).  Acting pursuant to authority granted by the AUMF, President Bush commenced

an invasion of Iraq on March 20, 2003.  (Am. Compl. ¶ 18, 19.)  The United States continues to

conduct military operations in Iraq, even though the Saddam Hussein regime has been

overthrown and a constitutional government has been elected.  (Id. ¶ 19.)  "There has never been

a Declaration of War by Congress against Iraq."  (Id. ¶ 24.)  Because President Bush ordered a

strike against Iraq without an explicit declaration of war, his authorization violated Article I,

Section 8 of the United States Constitution.  (Id. ¶ 54.)

Plaintiffs to this action include New Jersey Peace Action, a non-profit membership

corporation, and individuals Paula Rogovin, Anna Berlinrut, and Joseph Wheeler.  They all assert

various injuries associated with the decision to invade Iraq and seek a Declaratory Judgment,

pursuant to 28 U.S.C. § 2201, that the "war" in Iraq was unconstitutional.  Presently before the

Court is Defendant's motion to dismiss, in which three distinct arguments are raised – 1) the

Plaintiffs lack standing; 2) Plaintiffs' claims are barred by the political question doctrine; and 3)

Plaintiffs' claims lack merit.

## II.    Standing

Under Fed. R. Civ. P. 12(b)(1), a court must grant a motion to dismiss if it lacks subject-

matter jurisdiction to hear a claim.  Standing is a jurisdictional matter and thus "a motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1)."  Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007).  A 12(b)(1) motion to dismiss may be treated as either a "facial or factual challenge to the court's subject matter jurisdiction." Gould Electronics Inc. v. U.S., 220 F.3d 169, 176 (3d Cir. 2000).  Under a facial attack, the movant challenges the legal sufficiency of the claim and the Court considers only "the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff." Id.  In reviewing a factual attack, however, the challenge is to the actual alleged jurisdictional facts.  Thus, a court is free in that instance to consider evidence outside the pleadings.  Id. Finally, once a 12(b)(1) challenge is raised, the burden shifts and the plaintiff must demonstrate the existence of subject-matter jurisdiction.  PBGC v. White, 998 F.2d 1192, 1196 (3d Cir. 2000).  Here, Defendant offers extrinsic evidence challenging certain of Plaintiffs' jurisdiction assertions.  Thus, to the extent that certain of Plaintiffs' jurisdictional allegations are challenged on the facts, those claims receive no presumption of truthfulness.

Article III of the Constitution limits federal courts to the adjudication of actual "cases" or "controversies."  Several justiciability doctrines – including standing, mootness, ripeness, and political question – "state fundamental limits on federal judicial power in our system of government."  Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984).  "The Article III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important of these doctrines."  Id.; see also Sprint Commc'ns Co. v. APCC Servs., Inc., __ U.S. ____, 128 S. Ct. 2531, 2535, 171 L. Ed. 2d 424 (2008) (the "case-or-controversy requirement is satisfied only where a plaintiff has standing.").  The fact that

3

this is an action for Declaratory Judgment does not eliminate the requirement of standing –

rather, "[a] declaratory judgment may issue only where the constitutional standing requirements

of a justiciable controversy are satisfied."  National Ass'n For Stock Car Auto Racing, Inc. v.

Scharle, 184 Fed. Appx. 270, 274 (3d Cir. 2006); see also St. Thomas -St. John Hotel & Tourism

Ass'n, Inc. v. Gov't of the U.S. Virgin Islands, 218 F.3d 232, 240 (3d Cir. 2000) ("A declaratory

judgment or injunction can issue only when the constitutional standing requirements of a "case"

or "controversy" are met.").

 "In essence the question of standing is whether the litigant is entitled to have the court

decide the merits of the dispute or of particular issues."  Warth v. Sedlin, 422 U.S. 490, 498, 95

S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975).  Standing consists of three components.  First, "the

plaintiff must have suffered an injury-in-fact – an invasion of a legally protected interested which

is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351

(1992) (internal citations and quotation marks omitted).  Second, there must be a causal

connection between the injury and the offending conduct.  Id.  Thus, the injury must be "fairly

traceable" to the challenged action of the defendant.  Id.  Finally, "it must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision."  Id. at 561, 2136.

In the Declaratory Judgment context, the Third Circuit has acknowledged that declaratory

judgments are "frequently sought before injury has actually happened" and that in those cases

standing requirements are satisfied when "there is a substantial controversy, between parties

having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment."  Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643, 647

4

(3d Cir. 1990) (quoting <u>Maryland Casualty Co. v. Pacific Coal & Oil Co.</u>, 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed 826 (1941)).

 Plaintiffs bring the instant action asking only for a declaration that the 2003 order to invade Iraq was unconstitutional.  Thus, because the action is brought after-the-fact, the Court evaluates Plaintiffs' allegations under both the three-part <u>Lujan</u> inquiry as well as the less-stringent Declaratory Judgment analysis.  Finally, Plaintiffs bear the burden of establishing standing.  <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 342, 126 S. Ct. 1854, 1861, 164 L. Ed. 2d 589 (2006).

### A. Injury-in-Fact

 In this case, Plaintiffs allege various injuries.  First, Plaintiffs Paula Rogovin ("Rogovin") and Anna Berlinrout ("Berlinrout") allege nearly identical injuries.  Specifically, they allege that as registered voters, they were "deprived of the opportunity to vote for or against [their] elected representatives based upon how they voted on the issue of going to war in Iraq..."  (Am. Compl. ¶ 9, 12.)  Additionally, both Rogovin and Berlinrout allege that "the fact that no Declaration of War against Iraq was ever brought to a vote in Congress...directly caus[ed] [them] to suffer emotional, physical and psychological injury" and that they maintain "great anger at the President's blatant violations of the Constitution." (<u>Id.</u> ¶ 10, 12.)  Finally, they both allege the payment of an "opportunity cost" in terms of the time and resources expended to oppose the war, including "being compelled to pay tax dollars for an unconstitutional war."  (<u>Id.</u>)

 Plaintiff William Joseph Wheeler served in the United States Army from May 23, 2001 to January 5, 2004, and served in Iraq from March 2003 to November 2003.  (<u>Id.</u> ¶ 13.)  On January 5, 2004, he received an Honorable Discharge "as a result of a 'physical condition not a

disability.'" (Id.)  He is subject to recall to active duty until May 2009.  (Id.)  Wheeler alleges injuries comprising the "emotional, psychological and physical affects arising from the ordeal of combat..." (Id. ¶ 14.)  Finally, he claims to have "suffered injury by being compelled to obey orders that were unlawful because they were premised on the President's unconstitutional initiation of the War in Iraq without a Congressional Declaration of War." (Id.)  He also claims the potential of future injury should the United States initiate another war "in Iran or elsewhere in the absence of a Congressional Declaration of War." (Id.)  The Court addresses each claimed injury to evaluate whether it meets the "concrete and particularized" and "actual or imminent" requirements of Lujan.

First, the fact that Plaintiffs Rogovin and Berlinrout suffered some "opportunity cost" in terms of a re-direction of resources does not constitute an injury sufficient to garner Article III standing.  It is neither concrete nor particularized.  Nor is Plaintiffs' disagreement or strong anger at the President's decision to go to war an injury sufficient to establish standing.  "Disagreement with government action or policy, however strongly felt, does not, standing alone, constitute an 'injury' in the Constitutional sense which is cognizable in the federal courts susceptible of remedy by the judicial branch."  Evans v. Lynn, 537 F.2d 571, 598 (2d Cir. 1975).  The fact that a single Plaintiff disagrees with a governmental policy is not concrete or particularized and therefore does not raise adequately raise an "injury-in-fact."

Next, Plaintiffs Rogovin and Berlinrout claim injury arising from the deprivation of the opportunity to vote for or against their elected representatives on the issue of declaring war on Iraq.  This, too, fails to satisfy the well-established "concrete and particular" standard.  Under Plaintiffs' logic, all citizens would be entitled to bring this action because every voter was

6

effectively deprived of the right to have his or her representative cast a vote for or against declaring war on Iraq.  While Plaintiffs, and many like-minded voters, may have wanted to hear their representatives' views on a war with Iraq, the alleged absence of debate does not give rise to an Article-III injury.  Rather than particularized, this injury is the very epitome of general. "[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share."  Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 220, 94 S. Ct. 2925, 2932, 41 L. Ed. 2d 706 (1974).

As to Rogovin's and Berlinrout's desire to avoid paying taxes "for an unconstitutional war," that injury has been roundly dismissed by the Supreme Court.  A citizen does not gain standing to challenge a government action simply by being a taxpayer.  "[S]uits premised on federal taxpayer status are not cognizable in the federal courts because a taxpayer's 'interest in the moneys of the Treasury is shared with millions of others, is comparatively minute and indeterminable.'"  ASARCO Inc. v. Kadish, 490 U.S. 605, 613-14, 109 S. Ct. 2037, 2043, 104 L. Ed. 2d 696 (1989) (quoting Frothingham v. Mellon, 262 U.S. 447, 487, 43 S. Ct. 597, 601, 67 L. Ed. 1078 (1923)).  The only exception to the general bar on taxpayer standing was enunciated in Flast v. Cohen, where the Supreme Court outlined a narrow exception finding standing for challenges to government expenditures that violate the Establishment Clause.  392 U.S. 83, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968).  Plaintiffs do not argue that the Flast exception applies here. Thus, because Plaintiffs premise their suit on a generalized grievance stemming from the allegedly wrongful payment of taxes, their injury does not warrant Article III standing.

Finally, Plaintiff Wheeler's injuries are – at least in part – not proper injuries in fact.  To

the extent he asserts any future injury stemming from the possibility of recall to active duty in the event of a war with Iran (Am. Compl. ¶ 15), that injury is not actual or imminent.  No war on Iran has yet been declared.  Any associated injury is, therefore, purely speculative and does not present an actual "case or controversy" for this Court to adjudicate.  As to Wheeler's other injuries – namely the emotional and physical injuries he suffered in Iraq – Defendant argues that he lacks standing to challenge the orders of his Commander-in-Chief in a judicial forum.  Plaintiffs have not responded to this argument, and thus it is effectively conceded.  However, the Court does not rely upon his inability to question the orders of his military superiors as a basis upon which to deny standing.  In this instance, to the extent he alleges specific physical and emotional injuries, the Court proceeds to analyze those claims under the redressability prong of the Lujan analysis.

### B.    Causation

The parties only tangentially touch on causation, and the Court includes it simply to note that at least as to Plaintiffs' injuries stemming from the failure to cast an informed vote, the standing inquiry falls on causation as well.  Even if Congress had engaged in a full-fledged debate about the propriety of declaring war on Iraq, Plaintiffs would not necessarily have had the opportunity to hear their representatives' views on the subject.  Certainly, no representative is obligated to participate in debate or present all of his views on any given topic.  Thus, Plaintiffs cannot claim that their inability to hear their representatives' views is "fairly traceable" to the lack of a declaration of war.  This is especially true where, as here, Defendant has put forth several statements made by Plaintiffs' representatives during the debate on the AUMF clearly articulating their positions either for or against authorizing military force.

8

### C.   Redressability

Assuming *arguendo* that Plaintiffs had alleged injuries adequate to satisfy the first two prongs of the Lujan analysis, the standing analysis would still fail at the redressability stage.  In the redressability inquiry, it must be likely, not simply speculative, that the injury would be redressed by a favorable decision.  Even if the Court were to grant Plaintiffs the full relief they seek – a declaration that the order to invade Iraq was unconstitutional – none of Plaintiffs' injuries would be redressed.  Rogovin and Berlinrout would still lack the ability to cast a vote based upon their representatives' views on going to war with Iraq.  Nor would they recover any tax monies paid or other resources already expended in opposing the war.  As to Wheeler, a declaration of unconstitutionality in the form he seeks does not redress the fact that he obeyed allegedly unlawful orders.  Nor does it prevent or compensate for any emotional or physical injuries Wheeler may have suffered.  At the end of the day, the simple fact is that Plaintiffs filed this action more than five years after the commencement of hostilities in Iraq.  Plaintiffs have not rebutted or contested Defendant's claim that current and future deployments to Iraq are "deployments of troops to a friendly nation, at the request of that nation." (Def. Br. 14.)  Thus, because the allegedly illegal war has already concluded, Plaintiffs' lack of timeliness in bringing the present action is dispositive as to the issue of standing.  A judicial declaration of unconstitutionality would be, at best, an advisory opinion not sufficient to redress any of Plaintiffs' claimed injuries.

Nor does Plaintiffs' argument that they could seek damages, but have chosen to forego them, save their Complaint.  As an initial matter, under City of Los Angeles v. Lyons, 461 U.S. 95, 105, 103 S. Ct. 1660, 1667, 75 L. Ed. 2d 675 (1983), plaintiffs must establish standing for the

relief they presently seek, which is declaratory relief against future unconstitutional conduct.  The fact that past unconstitutional conduct might give rise to a claim for damages does not give rise to an action for declaratory relief against future conduct.  Id.  Additionally, however, monetary damages would not redress Plaintiffs' injuries arising from the inability to cast an informed vote or the opportunity cost of time lost to opposing the war.  Finally, and most importantly, Plaintiffs have no claim for monetary damages.  In the absence of a waiver, any damages suit against the United States for an alleged constitutional violation is barred by sovereign immunity.  United States v. Mitchell, 445 U.S. 535, 538, 100 S. Ct. 1349, 1351, 63 L. Ed. 2d 607 (1980). Moreover, the doctrine of sovereign immunity extends to individual officers sued in their official capacity, as in this case, because official-capacity suits are treated as suits against the entity. Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985).  Thus, Plaintiffs' argument that pleading damages would save their claims is legally incorrect.  Pleading damages would not only run afoul of sovereign immunity, it would also fail to establish standing as to the present declaratory judgment action.

Next, to the extent that Plaintiffs cite to Massachusetts v. Laird and Doe v. Bush for the proposition that both cases adjudicated the merits of a "failure to declare war" action rather than dismissing the suit on standing grounds, that contention is unpersuasive.  First, Massachusetts v. Laird, 451 F.2d 26 (1st Cir. 1971) is factually distinct.  It concerned an action brought to enjoin the ongoing war in Southeast Asia.  Id. at 28.  Thus, that case presented the possibility of redressing Plaintiffs' injuries by actually ending or enjoining the war.  Id.  Here, no such possibility exists.  Plaintiffs acknowledge that they cannot "undo the invasion of Iraq" and that they are not asking to "order the military home."  (Opp'n Br. 56.)  Unlike Massachusetts v. Laird,

their action comes after the war rather than before or during it, a difference that is fatal to the redressability prong of the standing analysis.  Next, in <u>Doe v. Bush</u>, the First Circuit did not find that Plaintiffs had standing to bring the action; rather, the Court decided not to "to reach all the issues concerning the justiciability of the case, including the question of the parties' standing." 323 F.3d 133, 135 n.2 (1st Cir. 2003).  The Court declined to hear the suit on the ground that it was not yet ripe for judicial review and simply noted that there is no required sequence to the consideration of non-merits issues.  <u>Id.</u>  Thus, having found the suit non-justiciable because of ripeness, it did not also need to reach the issue of standing.  Neither case, therefore, is on point with regard to the issue of standing in the present matter.

Finally, the Court notes that even under the standing inquiry as applied to Declaratory Judgments, Plaintiffs' claims fail.  At the very least, Plaintiffs have not alleged a dispute of "sufficient immediacy and reality" to warrant the issuance of a Declaratory Judgment.  Aside from the fact that a declaration of illegality would not redress their claimed injuries, Plaintiffs' allegations as to the need for such a declaratory judgment are based in large part on the potential for future "wars" with the countries of Pakistan or Iran.  (Am. Compl. ¶ 23.)  These theoretical wars are neither immediate nor real, and Plaintiffs accordingly lack standing to bring this action.[2]

At the end of the day, Plaintiffs allege too little and institute their suit too late.  Thus, as per <u>Lujan</u>, their claims are not justiciable because they fail to surmount their burden of proving

---

[2] Plaintiff NJPA is a membership organization.  In order to establish standing, it must prove that: (1) its members would have otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members.  <u>Friends of the Earth, Inc. v. Laidlaw Environmental Servs.</u>, 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).  As outlined above, Rogovin, Berlinrout, and Wheeler lack standing to sue in their own right.  Thus, Plaintiff NJPA fails the first prong of this test.

standing.[3]

## III.   Political Question Doctrine

Alongside standing, Defendant also moves to dismiss the allegations in the Amended

Complaint as non-justiciable pursuant to the political question doctrine and Fed. R. Civ. P.

12(b)(1).  Courts, however, are somewhat divided as to whether the political question doctrine

constitutes a jurisdictional or prudential limitation.  Corrie v. Caterpillar, Inc., 503 F.3d 974 (9th

Cir. 2007) ("...it is not a contradiction to speak of the political question doctrine as both

prudential and jurisdictional.").  While jurisdictional issues implicate Rule 12(b)(1), prudential

concerns would warrant evaluation under Rule 12(b)(6).  This Court, however, agrees that the

doctrine is "at bottom a jurisdictional limitation imposed on the courts by the Constitution, and

by the judiciary itself."  Id.  Thus, it is properly evaluated under Rule 12(b)(1), and the Court is

free to look beyond the face of the complaint to properly ascertain whether or not the political

question doctrine renders it non-justiciable.

In Marbury v. Madison, Chief Justice Marshall first articulated the political question

doctrine, by holding that the Constitution invested in the President "certain important political

powers, in the exercise of which he is to use his own discretion, and is accountable only to his

country in his political character, and to his own conscience."  Marbury v. Madison, 1 Cranch

137, 5 U.S. 137, 165-66, 2 L. Ed. 60 (1803).  Thus, "[q]uestions, in their nature political, or

---

[3] It is unclear whether Plaintiffs also rely upon the doctrine of "capable of repetition yet evading review."  Plaintiffs raise this doctrine in their Amended Complaint (¶ 4) but fail to acknowledge or reference it in their opposition brief.  In any event, the doctrine is inapplicable. If a plaintiff lacks standing, the doctrine of capable of repetition yet evading review does not save the claims.  Friends of the Earth, 528 U.S. at 191.  Thus, because Plaintiffs fail to establish standing, they cannot rely upon this doctrine to proceed to the merits.

which are, by the constitution and laws, submitted to the executive, can never be made in this

court." Id. at 170.  Since Chief Justice Marshall's initial formulation of the political question

doctrine, it has been broadened to preclude justiciability of allegations concerning, inter alia,

challenges to the impeachment process, questions implicating the Guarantee Clause,[4] and most

importantly for the present purposes, areas of foreign policy.  Nixon v. United States, 506 U.S.

224, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993) (holding that Senate retained the sole discretion to

choose impeachment procedures and therefore the controversy was non-justiciable); Luther v.

Borden, 7 How. 1, 48 U.S. 1, 12 L. Ed. 581 (1849) (finding that the Guarantee Clause of the

Constitution commits to Congress the issue of whether a particular government is the established

one in a State); Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S. Ct. 309, 311, 62 L. Ed.

726 (1918) ("The conduct of the foreign relations of our government is committed by the

Constitution to the executive and legislative – 'the political' – departments of the government,

and the propriety of what may be done in the exercise of this political power is not subject to

judicial inquiry or decision.").

In 1962, the Supreme Court set forth a broad formulation of political question analysis.

Baker v. Carr, 369 U.S. 186, 210, 82 S. Ct. 691, 706, 7 L. Ed. 2d 663 (1962).  Justice Brennan,

writing for a plurality, first held that the political question doctrine implicates the separation of

powers – that it arises from the "relationship between the judiciary and the coordinate branches

of the Federal Government, and not the federal judiciary's relationship to the States..." Id.  He

then set forth a six-factor determination to analyze whether an issue constitutes a non-justiciable

---

[4] The Guarantee Clause states as follows: "The United States shall guarantee to every
State in this Union a Republican form of Government."  U.S. Const. art. 4, § 4, cl.1.

political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious

Id. at 217, 710.  Where one of these factors is inextricable from a case, a federal court should dismiss the case on political question grounds.  Id.  However, the doctrine must be cautiously invoked, and the mere fact that a case touches on the political process does not automatically render it beyond the court's jurisdiction.  Nixon v. Herndon, 273 U.S. 536, 540, 47 S. Ct. 446, 446, 71 L. Ed. 759 (1927).

Under Baker, this Court finds that the present allegations clearly concern at least two of the Carr factors – the textual commitment of the issue to a coordinate political department and the lack of judicially discoverable standards for resolving it.  First, "the Constitution commits the entire foreign policy power of this country to the executive and legislative branches."  Atlee v. Laird, 347 F. Supp. 689, 694 (E.D. Pa. 1972); see also Doe v. Bush, 323 F.3d 133, 140 (1st Cir. 2003) ("The Constitution explicitly divides the various war powers between the political branches"); Ange v. Bush, 752 F. Supp. 509, 514 (D.D.C. 1990) ("there is an explicit textual commitment of the war powers not to *one* of the political branches, but to *both*") (emphasis in original).  Thus, while Congress retains the power to declare war, U.S. Const., art. 1, § 8, cl. 11; to raise and support armies, cl. 12, and to "provide and maintain a navy," cl. 13, the President is commander-in-chief of the armed forces.  U.S. Const. art. II, § 2, cl. 1.  The two branches share the broad array of war powers, and the Constitution allows them to work out disputes

14

themselves.

Given this textual commitment of "war powers" to the political branches, courts are rightfully reluctant to act in the absence of an actual dispute between Congress and the President. As Justice Jackson noted in <u>Youngstown Sheet & Tube</u>, there exists a "zone of twilight in which [the President] and Congress may have concurrent authority, or in which its distribution is uncertain.... In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law." <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 637, 72 S. Ct. 863, 871, 96 L. Ed. 1153 (1952) (Jackson, J., concurring). In this case, Congress deliberated and eventually passed the AUMF. Acting pursuant to the AUMF, President Bush invaded Iraq. No dispute has arisen between Congress and the President, and Plaintiffs make no such allegation. Rather, pursuant to the Constitution's joint power-sharing arrangement as to "war powers," the political branches have resolved this foreign policy dispute. In the absence of any alleged dispute between them, this court must stand down.

Plaintiffs attempt to avoid the "textual commitment" factor by arguing the merits – specifically, they claim that judicial abdication is unwarranted precisely because the "Declare War power is expressly committed by the text of the Constitution to Congress, not the Executive." (Opp'n Br. 44.) This argument is unavailing. The power to declare war certainly resides with Congress. U.S. Const. art. I, § 8, cl. 11. However, as the First Circuit noted, the power to declare war does not imply the more general negative that "Congress has no power to support a state of belligerency beyond repelling attack and short of a declared war." <u>Mass. v. Laird</u>, 451 F.2d 26, 32 (1st Cir. 1971). Rather, while the power to declare war was textually

committed to Congress, "the power to conduct undeclared hostilities beyond emergency defense...[was] committed to both branches, whose joint concord precludes the judiciary from measuring a specific action against any specific clause in isolation." Id.  The world of hostilities, therefore, does not neatly break down into the categories of "war" and "not war."  Rather, the political branches are empowered to conduct and maintain hostilities short of war and Congress may determine whether and when a declaration of war is necessary.  As Chief Judge Wyzanski, in the District of Massachusetts, held, "the distinction between a declaration of war and a cooperative action by the legislative and executive with respect to military activities in foreign countries is the very essence of what is meant by a political question." United States v. Sisson, 294 F. Supp. 511, 515 (D. Mass. 1968).  It is not enough to assert that the power to declare war resides with Congress and that therefore the judiciary is empowered to adjudicate any situation in which hostilities have commenced to determine whether or not those hostilities are tantamount to "war."  If this Court accepted Plaintiffs' invitation to make that decision, it would have to be prepared to fully measure every future instance of hostilities against the Constitution's "declare war" clause.  This the Court is not prepared to do.

Importantly, the very act of second-guessing Congress's decision not to declare war is outside of the judiciary's sphere of competence.  A declaration of war triggers "treaty obligations and domestic emergency powers." Massachusetts v. Laird, 451 F.2d 26 at 32.  "A determination not to declare war is more than an avoidance of a domestic constitutional procedure.  It has international implications of vast dimensions." Sisson, 294 F. Supp. at 515.  Rather than leaving to Congress the issue of whether to declare war and thereby invoke various corresponding obligations, Plaintiffs would have this Court second-guess Congress's decision to authorize

something short of "war."  This is plainly not the judiciary's role.  As a three-judge panel in

Atlee noted:

> Because the Constitution has given to Congress, and not the courts, the initial
> policy determinations whether to declare war formally and, if not, what steps to
> take short of formal declaration, we are bound not to enter the realm of foreign
> policy committed to another branch of government by adjudicating this question
> on the merits.

Atlee v. Laird, 347 F. Supp. at 706.  Congress is fully-equipped to analyze the treaties, policy

considerations, and accompanying obligations that would follow from a declaration of war and to

choose a separate path accordingly.  The fact that the United States is engaged in military action

absent a declaration of war does not automatically invite the judiciary's analysis as to whether

that action is "constitutionally sanctioned."

Finally, even if this matter were not textually committed to the political branches, the

Court is presented with no set of judicially manageable standards that would allow it to

determine whether indeed the United States was, or is, at war.  To resolve Plaintiffs' dispute, the

Court would have to propound a rational list of factors analyzing whether the country is actually

at war, or whether it is engaging in some form of hostilities short of war.  See, e.g., Atlee, 347 F.

Supp. at 705 ("[p]erhaps in 1787 it was possible to weight a given set of factors and decide

whether particular hostilities constituted war.  However, the variety of hostilities possible in

1972, makes the formulation of rational standards a task not met for the judiciary.").  Not only is

Congress better-equipped to make that determination, but under Baker, it is a determination that

is inherently fraught with a lack of judicially applicable standards.

The simple fact of the matter is that Plaintiffs ask this Court to adjudicate an issue that is

textually committed to Congress and the President.  In the absence of an actual dispute between

the political branches, this Court cannot intervene.  The issues raised are barred by the political question doctrine, and thus the suit must be dismissed.

**IV.**   **Conclusion**

Having evaluated the arguments in favor of and against dismissal of the present suit, the Court find that Plaintiffs' claims are not justiciable.  They have failed to clear the standing requirements of Article III and equally important, the issues raised by the Amended Complaint fall squarely within the political question doctrine.  Accordingly, Defendant's motion to dismiss is granted.

An appropriate Order accompanies this Opinion.


Dated:  May 15, 2009                                        /s/ Jose L. Linares
                                                                        United States District Judge

18